UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**Material Handling Systems, Inc,**                                   Plaintiffs
**and MHS Holdings, Inc.**

**v.**                                                    No. 3:21-cv-463-BJB-RSE

**Efrain Figueroa Cabrera**                                          Defendants
**and Precise Install Solutions, LLC,**

\* \* \* \* \*

OPINION AND ORDER

Efrain Figueroa Cabrera joined Material Handling Systems, Inc. in April 2019 as a mechanical superintendent. "MHS"—a subsidiary of co-plaintiff MHS Holdings—paid Cabrera roughly $250,000 a year, including bonuses, to hire and supervise teams that installed automatic conveyer systems. These complex systems sorted and moved packages for MHS's e-commerce and logistics customers—UPS, Amazon, DHL, and the like. When Cabrera signed his offer letter, he also signed a separate agreement not to compete with MHS, solicit its employees, or disclose its confidential information for two years after his departure.

While still working at MHS, however, Cabrera founded his own company—Precise Install Solutions—and began marketing it to potential customers, including Honeywell Intelligrated, a sometimes rival/sometimes customer of MHS. Cabrera accessed confidential bid and design information from MHS's computer system before he eventually resigned in June 2021. Earlier that year, Precise Install had successfully bid on and installed conveyer systems for Amazon, a customer of MHS. It performed this work as a subcontractor for Honeywell Intelligrated. Cabrera also apparently hired away many MHS workers to staff these Precise Install projects.

MHS caught wind of its employee departures and, eventually, Cabrera's competing venture. It and MHS Holdings sought a temporary restraining order, which this Court granted in part, as well as a preliminary injunction, which this Order grants, to enforce the terms of the noncompete, nonsolicitation, and nondisclosure provisions of Cabrera's employment agreement. After rounds of briefing and multiple arguments, including a full-day contested evidentiary hearing, Cabrera and Precise Install offer minimal resistance to the irreparability of MHS's harm, the correctness of its contract interpretation, or the applicability of the tort and trade-secret protections MHS has invoked. The Defendants instead contend that Cabrera lacked the opportunity, language skills, and consideration to enter the

restrictive covenant that the MHS plaintiffs seek to enforce. And they attack this Court's jurisdiction over a Texas resident and company.

At the preliminary-injunction stage, at least, the MHS plaintiffs have shown a strong likelihood of merits success and irreparable harm. The public interest likewise supports enforcing contracts and competition laws. And the Defendants would suffer no substantial harm from merely enforcing the agreement Cabrera signed.

## I.    MHS, Cabrera, and Precise Install

### A. Cabrera joins MHS

Cabrera[1] worked for 10 years for Honeywell Intelligrated. He hired and supervised teams that installed automatic conveying systems at customer sites across the country. *See* Cabrera Dep. (DN 48-1) at 53:1–55:23; Cabrera Aff. (DN 13-1) ¶ 15; Shane Clifton Decl. (DN 19-2) ¶ 14; Opp. Brief (DN 48) at 6. Those customers included Amazon, UPS, Walmart, Target, Home Depot, Lowe's, and others. Opp. Brief (DN 48) at 6.

Cabrera applied for and accepted a mechanical-superintendent position with MHS, a Kentucky-based competitor and customer of Honeywell Intelligrated, in March 2019. Opp. Brief (DN 48) at 7; Hearing Transcript (DN 56) at 147:15–23 (Ron Buckley testimony). Like Honeywell Intelligrated, MHS installs automatic conveyor systems at distributions centers. Complaint (DN 1-1) ¶ 17; Hearing Tr. at 147:6 (Buckley testimony). Its major customers similarly include large retail and delivery companies like Amazon, UPS, FedEx and DHL. Hearing Tr. (DN 56) at 147:18–19 (Buckley testimony).

Ronald Buckley, MHS's senior vice president for field services, interviewed Cabrera in Arizona on March 27, 2019. Taylor Aff. (DN 19-4) at 10. The same day, MHS offered him a job through an email, sent in English, by MHS's human resources director, Keli Taylor. *Id*. The email contained an offer letter, benefits summary, direct-deposit form, and other company information. *Id*.; Taylor Dep. (DN 44-3) at 27:13–29:01; 53:23–54:10. The offer letter said that "this employment offer is contingent on your agreement and signing of the attached non-compete agreement." Employment Agreement (Hearing Exhibit 3) at 1. (Although that agreement was not, in fact, attached to the offer letter, Cabrera received and signed a hard copy, as discussed below.) Taylor asked Cabrera to respond to the offer within two days. *See* Taylor Aff. (DN 19-4) at 10.

---

[1] Throughout this lawsuit, the Defendants have referred to Efrain Figueroa Cabrera as "Cabrera." With one exception: at the preliminary-injunction hearing (DN 56), the Defendants asked opposing counsel and the Court to refer to him as "Figueroa," which they did. Because Defendants' post-hearing brief, like their pre-hearing filings, again refer to him as "Cabrera," this opinion does the same.

The next day, Cabrera signed the letter and accepted the job offer. The letter called for Cabrera to start on April 9. Employment Agreement, Exhibit 3 at 1.

That much is basically undisputed. But the parties differ on when Cabrera signed the noncompete agreement: on March 27 when he received the job offer, or on April 9 when he started work. The likelier answer is March 27. Patricia Ocascio, a bilingual MHS recruiter, interviewed Cabrera and says she gave him copies of his restrictive covenant and other employment documents. *See* Ocascio Decl. (DN 59-1) at 2. Text messages between Cabrera and Ocascio indicate that Ocascio left Cabrera alone in the room so he could review and sign the documents. *Id.* at 2–3. Which he apparently did, responding by text to Ocascio: "All the paper work is on the table[;] thank you so much for the help." *Id.* at 2. This aligns with the date that appears on Cabrera's restrictive covenant—"3/27/19"—although originally another date was (inexplicably) written in place of "27" before being crossed out. *See* Cabrera Restrictive Covenant (DN 1-2) at 14; Cabrera Dep. (DN 48-1) at 47:7–12 (testifying "he d[id] not exactly remember" why he scratched out the date).

Cabrera testified at the hearing that he did not sign the restrictive covenant until April 9, when he started as an MHS employee. *See* Hearing Tr. (DN 56) at 207:14–209:19 (Cabrera testimony). He stated that Ocascio stood over him, told him he had to sign the documents, gave him no time to consult a lawyer, and instructed him to backdate the agreement to March 27, 2019. *Id.*

This testimony is in some tension with Cabrera's earlier statements. At his deposition, he testified that Ocascio gave him the covenant, but he couldn't recall whether that happened on March 27 or April 9. Cabrera Dep. at 44:15–45:10, 59:21–61:5. And his pre-hearing brief indicated that Cabrera did not recall whether he received his onboarding paperwork on March 27 or April 9. *See* Opp. Brief (DN 48) at 8.

Regardless of when he agreed to them, the terms of Cabrera's "Confidentiality, Proprietary Rights, and Restrictive Covenant Agreement" are clear. During the two years following his departure from MHS, Cabrera agreed he would not compete with MHS, solicit MHS employees, or disclose confidential information:

- **Compete:** "Employee shall not," without consent, "participate or engage in ... any business for a Competitor ... anywhere in the United States. The term 'Competitor' shall mean any entity having 25% or more of its revenue from operations involving the design, manufacture, installation or servicing of automated or manual sortation systems." § 4(a)(i).

- **Solicit Employees:** "Employee shall not," without consent, "solicit or induce any then-existing employee of the Company to leave employment with the Company or contact any then-existing customer or vendor

3

under contract with the Company or any of its subsidiaries for the purpose of obtaining business similar to that engaged in ... by the Company." § 4(a)(ii).

- **Disclose Confidential Information:** "Employee agrees that he or she will not, at any time, disclose to any third party any 'Confidential Information,'" "will use the Confidential Information only for the benefit of the Company," and will "deliver to the Company all of its property and Confidential Information." The agreement defines Confidential Information to include "confidential or trade secret information relating to the Business, including, but not limited to, matters of a technical nature, such as formulae, 'know how,' product specifications, data, compositions, designs, sketches, photographs, samples, inventions and ideas, ... customer lists, Customer contact information, Customer preferences, Customer information, pricing lists, contract, sales reports," and the like. §§ 1(a), 2.

Cabrera Noncompete Agreement (DN 1-2) at 14–19.

Cabrera served as a manager who supervised teams of up to 70 MHS employees installing conveyor systems at customer sites. *See* Job Description (DN 1-2) at 21–22; Clifton Dep. (44-1) at 53:3–54:6. He earned almost $250,000 annually, including bonuses. Cabrera Paystub (DN 13-1) at 11–13; Hearing Tr. at 27:18–25. Cabrera led the installation of parcel-conveyance systems at client facilities in Arizona, Indiana, and North Carolina. Hearing Tr. at 99:19–101:22; MHS Personnel Listing by Project (DN 44-18) at 1. And he served as a liaison between company engineers, project managers, MHS employees, and customer site managers. *See* Hearing Tr. at 99:19–102:9.

To allow Cabrera to fulfill these duties, MHS granted him access to the company's protocols regarding conveying systems and equipment, customer specifications, installation plans and schedules, and other proprietary protocols. Clifton Dep. (DN 44-1) at 152:23–153:3. The company trained Cabrera in cost reduction, quality improvement, customer service protocols, business techniques, and operational methods. Clifton Dep. (DN 44-1) at 53:3–53:6; Job Description (DN 1-1) at 55–56. These tasks involved information that MHS considered confidential and proprietary. *See* Clifton Dep. (DN 44-1) at 53:3–54:6; Eric Kierstead Dep., (DN 44-4) at 74:1–13, 79:8–80:13. MHS restricted who could access and distribute this information on its servers. *See* Kierstead Dep. (DN 44-4) at 19:8–20:20. MHS Holdings and Cabrera also signed an agreement that included a non-disclosure provision, a requirement that Cabrera safeguard and protect the company's confidential information, and a provision requiring Cabrera to return all confidential information when his employment ended. Restrictive Covenant (DN 1-2) at 14–19.

## B. Cabrera Launches Precise Install

While still employed by MHS, on July 29, 2020, Cabrera and his wife's cousin, Jose Mireles, drafted and filed incorporation papers for Precise Install Solutions in Texas. Certificate of Formation (DN 1-1) at 58–59; Precise Install 30(b)(6) Dep. (DN 34-2) at 11:11–25. Mireles loaned Cabrera $100,000 in startup funds for the endeavor. *See* Precise Install 30(b)(6) Dep. (DN 34-2) at 43:7–44:16, 97:18–98:8. In an early customer-solicitation email, Precise Install described its business as "install[ing] platforms, ARSAWs, Header Steel, [and] conveyors" for companies such as "Amazon, UPS, FXG [a FedEx subsidiary], F[edEx], DHL" and others. DN 34-6 at 2. Shortly after filing articles of incorporation, Cabrera discussed the new company with potential clients. *See, e.g.*, *id.* (September 16, 2020, email to Honeywell seeking opportunity to bid for installation contracts). Cabrera described himself as the "owner" of Precise Install and boasted of his company's "work force with strong skills and knowledge in Project Installation Management, administration, logistics, automation and steel construction." *Id.*

Rumors of a burgeoning relationship between Cabrera and Honeywell Intelligrated made their way back to Shane Clifton, Cabrera's supervisor at MHS, in the fall of 2020. Clifton Decl. (DN 19-2) ¶ 24. Upon hearing the news, managers became suspicious that Cabrera was engaged in a competing business. *Id.* So Clifton confronted Cabrera with the rumor, which Cabrera immediately denied. *See* Clifton Dep. (DN 48-3) at 99.

In the springtime, Cabrera recruited and MHS hired his Precise Install collaborator Jose Mireles as a materials coordinator for an MHS installation project—which Cabrera supervised—at a FedEx facility in North Carolina. *See* Clifton Dep. (DN 44-1) at 149:22–150:5, 150:24–151:11; Personnel Listing by Project (DN 44-18) at 1. Shortly after being hired, Mireles accessed an MHS computer database titled "Material Handling Systems Team Site – Amazon Projects – all documents." *See* Eric Kierstead Second Decl. (DN 44-17) ¶ 7. *MHS* never staffed Mireles on an Amazon project. *See* MHS Personnel Listing by Project (DN 44-18) at 1 (showing Mireles only worked on a FedEx project). But *Precise Install* was bidding on Amazon projects when Mireles tried to access the Amazon information. *See* List of Precise Install's Current and Future Work (DN 13-1) at 17. Precise Install employee records demonstrate that it paid Mireles $70 per hour between May 7 and July 17, 2021. *See* Precise Install Payroll (DN 44-37).

Cabrera continued working as a manager for MHS until June 14, 2021, when he tendered his resignation. He sent colleagues an email stating that he planned to "pursue another opportunity" nearer to his family. Clifton Decl. (DN 19-2) ¶ 36. That same day, Cabrera submitted a subcontractor bid to Honeywell Intelligrated, offering to staff 20 Precise Install employees on an installation project at an Amazon facility in Virginia in exchange for $750,000. *See* Precise Install June 14, 2021, bid to Honeywell Intelligrated (DN 44-31) at 9–10.

5

About two weeks after Cabrera resigned from MHS, he began soliciting MHS employees to join him on the Virginia project Precise Install was handling for Honeywell Intelligrated. *See* Cabrera Dep. (DN 48-1) at 83:7–12, 85:6-13, 86:4–19; 88:22–25, 89:19–90:1–17, 100:15–20, 101:25–103:16; Cabrera-Mireles Text Messages (DN 44-36). For example, Cabrera sent a text message to an MHS employee, Ernesto Troncoso, offering increased pay to Tronsoco and any other MHS employees who would join Precise Install. *See* Cabrera Dep. (DN 48-1) at 85:3–17, 89:1–92:18. Cabrera asked that these employees not tell anyone about Cabrera's involvement in their resignation from MHS. *See* Cabrera-Mireles Text Messages (DN 44-36); Cabrera Dep. (DN 48-1) at 92:1–24. On July 6, six MHS workers, including Troncoso, "abandoned" the MHS jobsite in North Carolina (where Cabrera had managed MHS employees before he resigned). *See* Ronald Buckley Decl. (DN 19-1) ¶ 67. Then they began to work for Precise Install on the Amazon project in Virginia. Precise Install Pay Records, (DN 44-37) at 17–18.

The day after these six workers left the MHS jobsite in North Carolina, Mireles also tendered his resignation to MHS. *See* Clifton Decl. (DN 19-2) ¶ 46. A post-resignation forensic review of Mireles's MHS-issued laptop, conducted by MHS's then-CIO Eric Kierstead, revealed that on Mireles's last day with MHS, Mireles inserted a USB device into his laptop, ostensibly to retrieve documents and other MHS information. *See* Kierstead Second Decl. (DN 44-17) ¶ 6. The record doesn't indicate what if anything Mireles took or retained through that USB device. The parties lack access to the information and to the USB drive—in part because they also lack access to Mireles, whom the Plaintiffs have not been able to locate during discovery. *See* Hearing Tr. (DN 56) at 13:4–22.

## C. MHS sought and obtained a TRO

MHS and MHS Holdings filed this suit on July 9, 2021, the same day Mireles left MHS. The Plaintiffs sought a temporary restraining order and an injunction to prevent Cabrera and Precise Install from breaching contractual noncompete, nonsolicitation, and nondisclosure provisions; misappropriating corporate secrets; violating Cabrera's fiduciary duties to MHS; and tortiously interfering with MHS's business and contracts. *See* State Complaint (DN 1-1) at 25–40; Brief to Extend TRO (DN 19) at 20–27, 35–38.[2]

---

[2] This lawsuit also asserts a variety of other torts and noncontractual causes of action. Plaintiffs claim Cabrera and Precise Install usurped MHS's corporate responsibilities, tortiously interfered with Cabrera's MHS employment contract, converted corporate assets, and unfairly competed with MHS. Brief to Extend TRO (DN 19) at 31–35, 38. Each of these claims, however, addresses alleged *past* harms without a serious likelihood of *future* repetition, and none is necessary to justify the relief awarded in this Order. "The purpose of an injunction," of course, "is to prevent *future* violations." *Michigan v. Sault Ste. Marie Tribe*

After a telephonic hearing on July 22, the Court determined that the Plaintiffs had a "strong likelihood of success on the merits" of their contract claims, at least, and issued a TRO preventing Cabrera from disclosing any MHS confidential information or participating in any business entity having 25% or more of its revenue from business operations in competition with MHS. *See* TRO (DN 10) at 2–3.

As the TRO approached its 14-day expiration, *see* FED. R. CIV. P. 65(b)(2), the Court heard oral argument on July 29 and "for good cause" extended the TRO to August 19. *See* DN 22. On the date of the extended TRO's expiration, the Court scheduled an in-person evidentiary hearing. Given the incomplete status of discovery, however, the parties agreed to defer the hearing. In the meantime they entered into a standstill agreement that maintained the terms of the TRO. This delay allowed them to complete expedited discovery and briefing before the Court heard evidence and decided MHS's request for a preliminary injunction. First Hearing on Motion for Preliminary Injunction (DN 35).

The Court ultimately held its evidentiary hearing on October 1. The parties offered a full day of witness testimony, documentary evidence, and arguments. Hearing Tr. (DN 56). At the end of the hearing, the parties asked to submit simultaneous post-hearing briefs, which they did on October 18.

## II.   Personal Jurisdiction

Just after the MHS plaintiffs filed this lawsuit, Cabrera and Precise Install asked the Court to dismiss it for lack of personal jurisdiction in Kentucky. Motion to Dismiss (DN 21). Based on the information in the record at this preliminary-injunction phrase, the Court disagrees. Though Cabrera is indeed a Texas citizen, and has not lived in Kentucky or worked at a project site here, he waived any objection to jurisdiction in the Western District of Kentucky by "consent[ed] to the personal jurisdiction of these courts" in his "Confidentiality, Proprietary Rights, and Restrictive Covenant Agreement." *See* Restrictive Covenant (DN 1-2) at 18–19. By signing, Cabrera "acknowledge[d] that the Company is based in Kentucky and will sign this Agreement in the Commonwealth of Kentucky," and that Cabrera himself was "entering a contract in Kentucky and … doing business there," such that Kentucky law would apply regardless of its conflict-of-law principles. *Id.* at 18. The agreement expressly "waive[d] [Cabrera's] right to challenge personal jurisdiction." *Id.* at 19.

Forum-selection clauses are "prima facie valid" and "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10–11 (1972); *see also Moses v. Bus. Card Exp.*, 929 F.2d 1131, 1136 (6th Cir. 1991) (same). Cabrera's

---

*of Chippewa Indians*, 737 F.3d 1075, 1081 (6th Cir. 2013) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added)).

restrictive covenant includes a forum-selection clause that specifically envisions litigation in Kentucky: "any dispute between Employee and the Company shall take place in the state or federal courts located in Jefferson County, Kentucky." Restrictive Covenant (DN 1-2) at 18. This agreement appears reasonable under the circumstances: the contract envisioned Cabrera working for a Kentucky-based company at project sites across the country. Certainly Cabrera has not offered any evidence or argument (as discussed below) that might overcome the presumptive validity of his restrictive covenant generally or cast doubt on the forum-selection clause in particular. *See Prezocki v. Bullock Garages*, 938 S.W.2d 888, 889 (Ky. 1997) (forum-selection clauses are enforceable unless defendant shows their unfairness or unreasonableness).

Even apart from the forum-selection clause, Cabrera likely has minimum contacts with the Commonwealth sufficient to confer personal jurisdiction consistent with the U.S. Constitution and Kentucky law. "To determine whether it has personal jurisdiction in a diversity case, the district court applies the law of the state in which it sits." *Pittock v. Otis Elevator Co.*, 8 F.3d 325, 327 (6th Cir. 1993). In Kentucky, personal jurisdiction may be established by minimum contacts with the state as described in KRS § 454.210(2). That list includes "transacting business in th[e] Commonwealth," KRS § 454.210(2)(a)(1), which Cabrera did. Just after being hired, Cabrera traveled to MHS headquarters in Kentucky to pick up his MHS-issued computer and cellphone; while there, he also attended meetings and trainings for forthcoming MHS assignments. Cabrera Dep. (DN 48-1) at 62:21–63:9; Travel Emails (DN 19-2, Exhibit 1) at 19–31. And he reported to a supervisor based in Kentucky throughout his employment with MHS. His visit and broader employment relationship likely provide a sufficient connection with the state that supports jurisdiction, independent of his contractual agreement to litigate here. *See Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914, 917–18 (6th Cir. 2019) (contract envisioning a "continuing and wide-reaching [relationship] with [the plaintiff] in [the forum]" creates sufficient contacts to confer personal jurisdiction. (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 479–80 (1985)); *see, e.g., Beavers v. Riley Built, Inc.*, 2017 WL 5633258 at *2–7 (W.D. Ky. 2017) (single visit to Kentucky by defendant's agent sufficed to confer jurisdiction under KRS § 454.210(2)).

What about Precise Install? Unlike Cabrera, his company is not party to a contract with a Kentucky counterparty, or to a forum-selection clause that selected Kentucky-based courts. Plaintiffs contend that jurisdiction over Precise Install is appropriate because the company is likely an alter ego of Cabrera's. *See* MHS Response to Motion to Dismiss (DN 32) at 15–17, based on Cabrera's ownership, leadership, and identity of interest with his new company.

MHS is probably right, though the record is thin. The Sixth Circuit has recognized that due process allows "a court to exercise personal jurisdiction over ... a corporation that would not ordinarily be subject to personal jurisdiction in that court when the ... corporation is an alter ego ... of a party that would be subject to personal

jurisdiction." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)). Kentucky courts ask whether parties have "such unity of ownership and interest that their separateness has ceased" in order to exercise jurisdiction over one as the alter ego of the other. *Inter-Tel Techs., Inc. v. Linn Station Properties*, 360 S.W.3d 152, 161 (Ky. 2012).

All of Cabrera's actions that MHS complains of relate to his leadership of Precise Install. Their overlapping interests and actions are obvious during the early months after Cabrera co-founded Precise Install. He held himself out as a leader of the new company to compete with his old company and recruit its employees. The only apparent reason Cabrera would take MHS information, at least based on the current record, is so Cabrera could use that information to get Precise Install off the ground. Which actions may fairly be said to have been taken by Precise Install, as opposed to Cabrera (or both), is not easy to untangle at this early stage of the proceeding. (Which of course points to a significant unity of their interests and diminution of their separation.) Suffice to say that a more than colorable basis exists to conclude Precise Install operated as Cabrera's alter ego during the company's first months.

Yet the Court need not definitively resolve whether MHS has shown Precise Install to be Cabrera's alter ego. Instead, as permitted by the Sixth Circuit, the Court will await ruling on Precise Install's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction pending further proof and argument regarding Precise Install's overlap with Cabrera. *See Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005) (district court has discretion to determine personal jurisdiction "based on affidavits alone," to "permit discovery, which would aid in resolution of the motion," or to "conduct an evidentiary hearing on the merits" of a Rule 12(b)(2) motion).

In any event, even assuming Precise Install is not Cabrera's alter ego, the question of jurisdiction over Precise Install is largely academic: a preliminary injunction against Cabrera would extend to Precise Install under Rule 65(d), which authorizes a court to enter an injunction that binds not only parties, but also "other persons who are in active concert or participation with" the parties. FED. R. CIV. P. 65(d)(2)(C); *see United States v. Hochschild*, 977 F.2d 208, 211–12 (6th Cir. 1992). No one disputes that Cabrera and Precise Install worked together, at least to some extent, in connection with all the events most important to this dispute. So any injunctive relief against Cabrera would naturally extend to Precise Install insofar as its activities occurred in concert with Cabrera's violation of his contractual or other legal obligations.

## III.   Preliminary Injunction

The MHS plaintiffs want Cabrera and Precise Install to stop working with or for MHS's clients and competitors, recruiting MHS employees to come work at Precise

Install, and using confidential information Cabrera obtained from MHS. This lawsuit asks for a preliminary injunction—"an extraordinary remedy" reserved for preserving the status quo and avoiding irreparable harm before trial. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

"Given this limited purpose, 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). And given the abbreviated nature of these proceedings, a party need not "prove his case in full" to obtain a preliminary injunction. *Id.*

But a plaintiff must still carry its burden of proof, and a court must make preliminary findings, on a four-factor test that examines (1) the likelihood of the plaintiff's success on the merits, (2) irreparable harm to the plaintiff absent the injunction, (3) substantial harm to others caused by granting the injunction, and (4) the public interest in enjoining the defendants' activity. *See Hall v. Edgewood Partners Ins. Center*, 878 F.3d 524, 526–27 (6th Cir. 2017). Courts "balanc[e]," "rather than tall[y]," these factors, at least "[so] long as there is some likelihood of success on the merits." *Id.* at 527.

At this stage, the evidence and arguments before the Court on each of the four factors support a preliminary injunction.

## A. Likelihood of Success on the Merits

MHS is likely to succeed on the merits in enforcing the noncompete, nonsolicitation, and nondisclosure provisions of Cabrera's "Confidentiality, Proprietary Rights, and Restrictive Covenant Agreement," DN 1-2 at 14–19.

### 1. Contract Enforceability

The Defendants principally argue that the employment agreement is unenforceable in light of four basic contract defenses: lack of mutual assent, lack of consideration, unconscionability, and voidness under public policy.[3]

---

[3] The Defendants also fault MHS for not authenticating the Restrictive Covenant. *See* Supp. Br. (DN 60) at 5 n.1. But this is meritless, particularly at the preliminary-injunction stage when the Rules of Evidence don't apply in full force. Cabrera never denied he signed the agreement. *See* Cabrera Restrictive Covenant (DN 1-2) at 14; Cabrera Dep. (DN 48-1) at 47:2–48:24. And Keli Taylor rebutted the contention that MHS signed it only in anticipation of litigation. *See* Taylor Dep. (DN 44-3) at 51:21–52:4 (former HR Director Jamie Elmore signed the agreement before he left the company in June 2020; Plaintiffs' Supp. Brief (DN 59) at 11 n.1.

### a. Mutual Assent

The Restrictive Covenant was made "by and between MHS Holdings, Inc., a Kentucky corporation, together with its subsidiaries (collectively called the **'Company')** and Efrain Figueroa Cabrera." DN 1-2 at 14 (emphasis in original). Cabrera argues that he worked only for Material Handling Systems, Inc., not MHS Holdings, Inc.—but contracted only with MHS Holdings, not MHS. In his view, this is a fundamental flaw in the contract's formation—essentially a lack of mutual assent—that prevents *either* Plaintiff from enforcing the agreement against him: MHS because it didn't sign the covenant, and MHS Holdings because it didn't pay him any consideration (as discussed in the next section). Opp. Brief (DN 48) at 14–16.

As to MHS, this is an unreasonable—even a cynical—interpretation of the contractual text. The agreed terms referred to MHS Holding's "subsidiaries," which obviously include Material Handling Systems. The agreement expressly contemplates obligations running between Cabrera and an MHS Holdings subsidiary such as MHS. Cabrera cannot avoid enforcement by a subsidiary. That would impermissibly read the second clause right out of the contract. *See, e.g.*, *Ducros v. C.I.R.*, 272 F.2d 49, 52 (6th Cir. 1959) ("We cannot ignore the plain language of the ... contract.").

### b. Consideration

In any event, MHS Holdings is also a plaintiff in this case. And it is directly named as a party to the Restrictive Covenant. Why couldn't it enforce those terms against Cabrera, even assuming MHS couldn't?

The answer, according to Cabrera, is that the agreement with MHS Holdings lacked consideration because only MHS employed him and paid his wages. Opp. Br. (DN 48) at 15 ("Cabrera received no consideration whatsoever for allegedly signing" the covenant, and "was employed by Material Handling, not MHS Holdings.")

That's incorrect. Cabrera signed an employment agreement with MHS that plainly stated his "employment offer" was "contingent on [his] agreement and signing of the … noncompete agreement." Employment Agreement (DN 56 Exhibit 3) at 1. So MHS *did* give Cabrera consideration—his new $250,000 job as a mechanical superintendent—for signing the Restrictive Covenant. Under straightforward principles of contract law, the offer of gainful employment in exchange for agreement to a restrictive covenant qualifies as consideration supporting the enforceability of the covenant's terms. *Higdon Food Servs. v. Walker*, 641 S.W.2d 750, 751–52 (Ky. 1982) ("The hiring itself ... was sufficient consideration" for a noncompete contract); *Central Adj. Bureau, v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 685 (Ky. Ct. App. 1981) (same).

11

Cabrera nevertheless contends that his employment agreement predated the noncompete agreement by 13 days, such that MHS's promise of future employment could not represent consideration for the later covenant provisions. In other words, Cabrera says he received his consideration in March when he took the job, and didn't receive any (additional) consideration in April when he signed the covenant. Opp. Brief (DN 48) at 35–36.

This position is untenable in many respects. The best reading of the current record indicates that Cabrera signed both agreements on March 27 or 28—within at most 1 day, not 13. *See* above at § I.A. Even if that's wrong, however, the employment agreement expressly tied the consideration of Cabrera's job to his promise not to compete: the "employment offer [wa]s contingent on [Cabrera's] agreement and signing of ... the noncompete agreement." Employment Agreement, (Hearing Exhibit 3) at 1. So Cabrera assented to noncompete obligations when he signed the offer letter and accepted the job. *See Dixon v. Daymar Colleges Group*, 483 S.W.3d 332, 344 (Ky. 2015) ("Incorporation by reference is an historic common-law doctrine. For a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'"); *Brass Reminders Co. v. RT Eng'g Corp.*, 844 F. App'x 813, 820–21 (6th Cir. 2021) ("clear language express[ed] the incorporation of other terms and conditions" (quoting *Bartelt Aviation, Inc. v. Drylake Coal Co.*, 682 S.W.2d 796, 797 (Ky. Ct. App. 1985)).

In any event, Kentucky precedents have upheld and enforced noncompete agreements signed "at a time other than concurrently with employment." *Alph C. Kaufman, Inc. v. Cornerstone Industries*, 540 S.W.3d 803, 813 (Ky. Ct. App. 2017); *see Central Adj. Bureau, Inc.*, 622 S.W.2d at 685. Whether the agreements were signed one day apart or two weeks apart, the record makes plain that MHS required Cabrera to sign the covenant not to compete in order to start his new job. Whether he signed the moment he accepted that job, or the moment he started it, makes little difference.

Even if the job *offer* weren't valid and contemporaneous consideration, moreover, Cabrera's *continuation* in that job would be. Kentucky law recognizes an "implied promise to continue the employee's employment" for an "appreciable length of time" as valid consideration for noncompete agreements signed *after* employment began. *Central Adj. Bureau*, 622 S.W.2d at 685. And a noncompete agreement may represent valid consideration if, after its signature, the employee receives "specialized knowledge, training and expertise [he] would not have otherwise acquired." *Charles T. Creech Inc. v. Brown*, 433 S.W.3d 345, 354 (Ky. 2014) (quotation omitted); *see Central Adj. Bureau, Inc.*, 622 S.W.2d at 686.

Both theories of consideration would apply here to render a post-acceptance covenant enforceable. The continuation of Cabrera's employment depended on his agreeing to the noncompete provisions. MHS requires "all employees ... hire[d] [to] sign a noncompete" agreement. Clifton Dep. (DN 44-1) at 106:17–18; *see also* Employment Agreement (Hearing Exhibit 3) at 1. MHS's HR representative testified

that MHS would not have hired Cabrera had he not signed the Covenant. *See* Taylor Dep., (44-3) at 17:24–18:2. And Cabrera himself admitted that he knew the noncompete document "was something he had to sign to be a Material Handling employee." Opp. Brief (DN 48) at 8 (citing Cabrera Dep. (DN 48-1) at 45:16–18; 48:21–50:01). The company fulfilled this promise of employment with more than two years of gainful work. *See, e.g.*, Taylor Dep. (DN 44-3) at 36:13–37:20 (Cabrera received a $30,000 field bonus in 2020 for good performance). Cabrera also received specialized, technical, and leadership training from MHS, which Clifton testified to at the hearing. Hearing Tr. (DN 56) at 144:3–14 (Clifton testimony). So did Buckley. *Id.* at 151:3–155:24. And, at his deposition, so did Cabrera. (DN 48-1) at 16:12–17:14; 18:24–19:6; 65:5–17 (describing MHS training).

Regardless of how and when the consideration is characterized, therefore, MHS provided enough to render the agreement enforceable. *See Central Adj. Bureau*, 622 S.W.2d at 685; *Charles T. Creech, Inc.*, 433 S.W.3d at 354.

### c. Unconscionability

Cabrera also argues that MHS procured his signature to the Restrictive Covenant by procedurally unconscionable means: by not giving him, as a Spanish speaker, enough time to review its English-language terms before signing. Opp. Br. (DN 48) at 15–16, 33, 36–37. But these arguments fail as a matter of fact and as a matter of law.

No evidence shows MHS restricted Cabrera's ability to review the agreement, translate it, or consult a lawyer. As discussed above (at § I.A), Cabrera likely signed his Employment Agreement and Restrictive Covenant on March 27, 2019. After his interview on March 27, Patricia Ocascio, who spoke both English and Spanish, provided Cabrera with his onboarding paperwork. *See* Ocascio Decl. (DN 59-1) ¶¶ 2, 7–8 (9:41 a.m. text message). She left the Restrictive Covenant on a table at the job site for Cabrera's review. Ocascio Decl. (DN 59-1) ¶ 8. Cabrera did not request more time to review it, a Spanish-language version, or the chance to review it with a lawyer. Cabrera Dep. (DN 48-1) at 44:15-45:5, 49:10–50:8; Ocascio Decl. (DN 59-1) ¶ 12; Taylor Aff. (DN 19-4) ¶¶ 13–17. Cabrera never asked a question about the requirement that he sign the Restrictive Covenant as a condition of his employment. Hearing Tr. (DN 56) at 226:5–227:18 (Cabrera testimony). Instead, he knew he had to sign the "document to be an employee of Material Handling Systems." Cabrera Dep. (DN 48-1) at 49:12–15. He did so and sent Patricia Ocascio a text message to that effect, 32 minutes after Ocascio left the paperwork for him, at 10:13 a.m, saying he left his signed paperwork on the table. Ocascio Decl. (DN 59-1) ¶ 10 (10:13 a.m. text message) As to the offer letter, Keli Taylor, an HR director for MHS, emailed it to Cabrera on the evening of March 27, asking him to "reply no later than March 29th." Taylor Aff. (DN 19-4), Exhibit 1. Cabrera—without any evident objection—signed the employment agreement the next day and returned it to Taylor. *See* Hearing Tr. (DN 56) at 225:3–227:18 (Cabrera testimony).

"It is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and ... if he has an opportunity to read the contract which he signs he is bound by its provisions." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011) (quoting *Clark v. Brewer*, 329 S.W.2d 384, 387 (Ky. 1959)).[4]  Cabrera offers no evidence that would overcome this presumption.  Before his counsel raised these language-barrier and lack-of-time arguments in this litigation, nothing indicated Cabrera didn't understand the contract.  *See* Cabrera Dep. (DN 48-1) at 44:15-45:5, 49:10–50:8; Ocascio Decl. (DN 59-1) ¶ 12; Taylor Aff. (DN 19-4) ¶¶ 13–17.

Contracts obtained by lies or fraud, of course, may be considered procedurally unconscionable and therefore unenforceable.  *See Hathaway*, 336 S.W.3d at 90; *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 343 (Ky. Ct. App. 2001). "Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement.  It includes, for example, the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term." *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013).

Cabrera, however, points to no confusing term, no lies, and no fraud.  *See Hathaway*, 336 S.W.3d at 89–90.  He himself testified that his offer letter explicitly listed the agreement not to compete as a prerequisite of employment.  Cabrera Dep. (DN 48-1) at 60:22–61:5; Hearing Tr. (DN 56) at 225:3–227–18.  And he did not testify that MHS pressured him into signing the agreements.  Cabrera Dep. (DN 48-1) at 49:10–50:4; Hearing Tr. (DN 56) at 228:10–230:4.

Other objections by Cabrera lack any basis whatsoever.  He argues that MHS did not attach the Restrictive Covenant to  the email that delivered his offer letter.  Opp. Brief (DN 48) at 8.  He argues that no one explained what the document was, or that by signing it he surrendered his legal rights.  *See id.* at 33.  And he argues that MHS should have recommended he consult with an attorney before signing.  *See id.* at 37.  But Cabrera cites no law for any of these propositions.  And he does not explain how these alleged omissions amount to lies, misrepresentations, or fraud.  *Contra Hathaway*, 336 S.W.3d at 89–90 (listing fraudulent inducement and misleading statements as possible reasons to find a contract unenforceable).

---

[4] *See also Estate of Green ex rel Moore-Stewart v. LP Louisville S., LLC*, 2018-CA-000738-MR, 2020 WL 3401188, at *3–4 (Ky. Ct. App. June 19, 2020) (contract was valid despite contractor "never provid[ing] a copy of the agreement to review or rescind, or the opportunity to consult with an attorney" because "one who signs a contract is presumed to know its contents") (quotation omitted); *Brass Reminders Co.*, 844 F. App'x at 821 ("[A] person is presumed to know [a contract's contents] which reasonable diligence on his part would bring to his attention.") (quoting *LP Louisville E., LLC v. Patton*, 621 S.W.3d 386, 401 (Ky. 2020)).

Finally, Cabrera requests leniency based on his limited English. Opp. Brief (DN 48) at 5, 8; Hearing Tr. (DN 56) at 230:21–231:22. The record casts serious doubt on Cabrera's alleged inability to speak, write, or understand the English language. Cabrera sent numerous emails and text messages in plain English to a variety of recipients. *See, e.g.*, Clifton-Cabrera Emails (DN 19-2, Exhibit 2 at 32–48); Precise Install Email (DN 34-5). Deposition and hearing testimony from MHS employees stated that Cabrera received all his trainings in English, supervised English-speaking employees, and communicated in English to his supervisors and peers. *E.g.*, Hearing Tr. (DN 56) at 101:20–103:14 (Clifton testimony); Clifton Dep. (DN 44-1) at 37:7–40:9; Taylor Dep. (DN 44-3) at 99:3–101:5. MHS even relied on Cabrera to serve as an informal translator between English and Spanish-speaking employees. *See* Taylor First Decl. (DN 19-4) at ¶¶ 9, 23.

Even if Cabrera didn't speak English, Kentucky law does not recognize that status as a sufficient defense to enforcement of an otherwise valid contract. *See Nsaif v. The Cheesecake Factory*, No 3:17-cv-641, 2018 WL 5045212, at *1 (W.D. Ky. Oct. 17, 2018) (the general rule that a person "who signs a contract is presumed to know its contents" rule applies to someone who "[could] []not read or write English") (citing *Hathaway*, 336 S.W.3d at 90); *see also Brass Reminders*, 844 F. App'x at 821–22 (6th Cir. 2021) (citing *Hathwaway* rule and upholding a contract despite employee's protest that he did not understand key terms).

### d. Inconsistency with Public Policy based on the Scope of the Restrictive Covenant

Cabrera contends the Covenant's noncompetition provisions are unenforceable because they are unreasonable in scope and duration in violation of public policy. But "Kentucky law favors the enforcement of reasonable noncompete clauses." *Edwards Moving & Rigging, Inc. v. Lack*, No. 2:14-cv-2100, 2014 WL 12531102, at *2 (W.D. Tenn. March 5, 2014); *see Central Adj. Bureau*, 622 S.W.2d at 685–86 (noncompetition clauses can be specialized businesses' only protection against employees resigning with the businesses' clients and know-how). "[T]he policy of this state is to enforce [noncompetition clauses] unless very serious inequities would result." *Lareau v. O'Nan*, 355 S.W.2d 679, 681 (Ky. 1962); *see also Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000) (collecting Kentucky cases). To determine reasonableness and consistency with public policy, Kentucky courts consider the scope of a company's business and whether the restrictive covenant is tailored to the company's interest in protecting its information and customer base. *See Crowell v. Woodruff*, 245 S.W.2d 447, 449 (Ky. 1951).

The noncompete provision at issue purports to bind Cabrera "[d]uring employment and for two (2) years immediately after Employee ceases to be employed by the Company." Restrictive Covenant (DN 1-2) at 17. Courts applying Kentucky law have repeatedly enforced two-year nationwide noncompete clauses. In C*entral Adjustment Bureau*, the Kentucky Court of Appeals upheld a two-year nationwide

noncompete clause based on the company's national presence, reputation, and customer base. *See* 622 S.W.2d at 686. Similarly, in *Lareau v. O'Nan*, that same court upheld a more geographically limited five-year noncompete agreement because the agreement protected the interests of the employer who provided "professional services" in a particular region. *See* 355 S.W.2d at 681. Federal courts have followed suit. *See, e.g.*, *Edwards Moving & Rigging*, 2014 WL 12531102 at *2 (upholding noncompete with "a duration of two years ... and a national geographic scope, considering [the company's] geographic range of business"); *Gardner Denver Drum LLC v. Goodier*, No. 3:06-cv-4, 2006 WL 1005161, at *8 (W.D. Ky. Apr. 14, 2006) (enforcing three-year prohibition against employee working with any business that competed with former employer in the United States).

Those precedents require enforcement of this agreement, too. MHS is a national brand offering "material handling automation solutions" across the United States and around the world. Hearing Tr. (DN 56) at 147:1–19 (Buckley testimony); Buckley Dep. (DN 44-2) at 25:17–26:7. It has offices in Kentucky, Georgia, Illinois, Michigan, Missouri, and Tennessee. Buckley Dep. (DN 44-2) at 27:4–12; Complaint (DN 1-1) ¶ 17. Its clients include UPS, FedEx Ground, Amazon, and other globally recognized companies. *See* Buckley Dep. (DN 44-2) at 87:24–88:3; Complaint (DN 1-1) ¶¶ 18–19. MHS has a global customer base and handles installation projects across the United States, as evidenced by Cabrera's own widespread work in Arizona, Indiana, and North Carolina. *See* Buckley Dep. (DN 44-2) at 35:9–13; Complaint (DN 1-1) ¶ 25. And the noncompete agreement of course framed the parties' agreement in nationwide terms: " any business for a Competitor ... anywhere in the United States." Restrictive Covenant (DN 1-2) at 17.

Cabrera also protests that the injunction MHS seeks would force him to work "outside of the industry he worked in for over a decade." Opp. Br. (DN 48) at 34 (citing *Crowell v. Woodruff*, 245 S.W.2d at 449). This too is unpersuasive. Limiting future employment options is precisely the point of a noncompete agreement, which Kentucky law and Kentucky courts regularly enforce when tailored in scope and duration similarly to this agreement. *See Lareau*, 355 S.W.2d at 681 (requiring defendant to show "very serious inequit[y]" before considering a restrictive covenant to be contrary to public policy); *see also Morgan Stanley & Co. v. Dempsey*, No. 07-89, 2007 WL 9747354, at *3–4 (E.D. Ky. June 1, 2007) (distinguishing *Crowell* as a fact-bound outlier among later Kentucky precedents). To the extent Cabrera complains that he lacks the ability to find work outside his chosen field, this too is inherent in any noncompete agreement signed by someone who works in a nationwide market. Cabrera has offered no evidence that he couldn't find work outside the field of "design, manufacture, installation or servicing of automated or manual sortation systems for the courier, warehouse and distribution or e-commerce market." Restrictive Covenant (DN 1-2) at 17. Nor has he pointed to any law indicating that such an inability, if true, would bar enforcement of a noncompete agreement.

### 2.    Breach of Contract

Because all Cabrera's arguments against enforceability fail, the next question is whether Cabrera breached that Restrictive Covenant.  MHS persuasively contends that he has done so in three respects.

### a.  Noncompete Agreement

Cabrera agreed that for a period of two years after employment he would not: "[P]articipate or engage in ... any business for a Competitor ... anywhere in the United States."  Restrictive Covenant (DN 1-2) at 17.  The agreement goes on to define "Competitor" as "any entity having 25% or more of its revenue from operations involving the design, manufacture, installation or servicing of automated or manual sortation systems."  *Id.*

Cabrera likely breached this provision by founding and operating Precise Install, which he described as a business that "install[ed] platforms, ARSAWs, Header Steel, [and] conveyors" for companies such as "Amazon, UPS, FXG, FXE, DHL" and others.  Precise Install Email (DN 34-5) at 2.  While continuing to work for MHS, Cabrera held himself out as the "Owner" of Precise Install Solutions and discussed the company with potential clients.  *See, e.g.*, DN 34-5 at 2 (email to Honeywell seeking opportunity to bid on installation business).  According to a declaration submitted by Honeywell Intelligrated, Cabrera boasted a "work force with strong skills and knowledge in Project Installation Management, administration, logistics, automation and steel construction." Honeywell Intelligrated Decl. (DN 44-5) ¶ 12.

By January 2021, Cabrera had informed a potential Precise Install client that his company had a workforce of 50, but could grow to 70 in short order if needed. Email to Honeywell Intelligrated (DN 34-9).  Honeywell Intelligrated soon awarded Precise Install contracts for two Amazon installation projects in Texas.  *See* DN 44-20.  Cabrera and Precise Install, in the course of this litigation, have described contracts worth nearly $5 million in revenue that Precise Install secured to work on conveyor-system projects for Honeywell and Intelligrated.  *See* DN 16 at 4 (request for security).

Cabrera and Precise Install nevertheless argue that Precise Install does not compete with MHS.  Defendants attempt distinguish Precise Install and MHS based on their relative size and the nature of their work.  MHS is a large multinational corporation, while Precise Install employed a comparatively small team of 70.  *See* Opp. Brief (DN 48) at 39. This, according to Defendants, merely amounts to a staffing company that does not directly perform actual installation work for any competitive entities.  *See* Opp. Brief (DN 48) at 2–3; Defendants' Supp. Brief (DN 60) at 10–11.

Both proffered distinctions are unpersuasive.

As to size, Cabrera's noncompete agreement does not distinguish between competitive entities based on the number of employees. Instead, it prohibits work with "*any* entity having 25% or more of its revenue from operations involving the design, manufacture, installation or servicing of automated or manual sortation systems for the courier, warehouse and distribution, or e-commerce market." Restrictive Covenant (DN 1-2) at 17 (emphasis added). Cabrera doesn't contend that Precise Install receives less than 25% of its revenue from such operations—though, as discussed below, he characterizes those operations as staffing rather than installation.

As to the nature of Precise Install's work, the company's name and Cabrera's own past statements belie the argument that this is merely a staffing agency. "Precise Install Solutions" bears little or no connection to staffing, but certainly connotes installation. Cabrera's past customer solicitations indicate that Precise Install directly competes with MHS. Cabrera promoted his new company's expertise in the "*installation* of platforms, ARSAWs, Header Steel, [and] conveyors." Precise Install Email (DN 34-5) at 2 (emphasis added). Another time he wrote about "inventory, prepping [work sites], stag[ing] material[s]," and overseeing a team of installers on projects. Email to Honeywell Intelligrated (DN 44-12) at 2. And during the hearing, Cabrera admitted that he and his company retain on-site leaders who perform and oversee installation work. Hearing Tr. (DN 56) at 238:15–24. True, Precise Install's business (like most other companies) depends on supplying labor. But that is not all, or even most, of what Precise Install offers in the marketplace. No evidence indicates, for example, that any customer ever considered hiring Precise Install to staff anything *other than* conveyor installation—no demolition, construction, or other task that might lend itself to temporary labor. Rather, Cabrera harped on Precise Install's competence in the conveyor-installation market. No evidence allows him to now recast the company's mission to avoid liability under his noncompete agreement. That would require a showing based on revenue percentages, not wordplay.[5]

---

[5] Plaintiffs further claim that the facts supporting a breach-of-contract claim also support a finding that Cabrera violated his fiduciary duties to the company. *See* PI Brief (DN 44) at ¶¶ 7–10. Even an employee who is not an officer may owe his employer a fiduciary duty if the employee maintains a position of trust within the company and is permitted access to private information and resources. *See ATC Distrib. Group v. Whatever It Takes Transmission & Parts*, 402 F.3d 700, 715–16 (6th Cir. 2005) (quoting *Steelevest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 485 (Ky. 1991)).

Cabrera likely owed fiduciary duties to his employee because, as his contract notes, he "occup[ied] a position of trust and confidence" in the company. Employment Agreement (DN 1-2) at 14. Cabrera was a managerial employee who led multimillion-dollar projects without direction from corporate officers. *See* Hearing Tr. (DN 60) at 21:13–16 (Clifton describing Cabrera as an employee with "no day-to-day supervision" in his duties which included "running jobs ... independently," "overs[eeing] payroll," "overs[eeing] purchasing"

### b. Nonsolicitation Agreement

The Restrictive Covenant also proscribed Cabrera from "solicit[ing] or induc[ing] any then-existing employee of [MHS] to leave employment" with the company or from contacting "any then-existing customer or vendor under contract with [MHS] ... for the purpose of obtaining business similar to that engaged in, or received (as appropriate), by [MHS]." DN 1-2 at 17.

Evidence indicates, however, that Cabrera secretly solicited MHS contract employees to leave MHS in order to join Precise Install.[6]  He admitted during his deposition that he texted Ernesto Troncoso, an MHS employee, and "offered him a job." DN 48-1 at 88:23–25.  Cabrera then asked Troncoso to extend the Precise Install offer to other MHS employees with whom he had a connection. *See id.* at 95:15–99:21; Hearing Tr. (DN 56) at 247:13–248:15.

Cabrera told the workers that Precise Install would pay more than MHS if they jumped ship. *See* Cabrera Dep. (DN 48-1) at 83:7-12; Hearing Tr. (DN 56) at 248:10–23 (Cabrera testimony).  And he instructed the new employees to conceal their employment with Precise Install from MHS supervisors. *See* Cabrera Text Messages (DN 44-36) ("I'm asking you to say that you are not coming with me, please.").

Apparently in response to this solicitation, six MHS workers left their position at an MHS worksite and joined Precise Install on July 7, 2021. Hearing Tr. (DN 56) at 248:2–250:22 (Cabrera testimony); *see* Precise Install Paysheet (DN 44-37) at 17–18 (listing worker names).  On that same day, Jose Mireles tendered his resignation from MHS. *See* Clifton Decl. (DN 19-2) ¶ 46.  Cabrera had recruited Mireles to join MHS in March.  Clifton Dep. (DN 44-1) at 149:22–150:5; 150:24–151:11. Yet by May, Mireles began to receive pay from Precise Install *and* MHS.  He worked for both companies into July.  *See* Precise Install Paysheet (DN 44-37); Clifton Decl. (DN 19-

---

and more); *id.* at 163:7–9 (Buckley describing Cabrera as a "highly-paid superintendent overseeing a multi-million-dollar project").  MHS granted Cabrera access to confidential corporate data including bid lists, pricing sheets, company best practices, and other technical documents.  *Id.* at 157:16–158:12 (Buckley testimony); Kierstead Dep. (DN 44-4) at 88:2–23; Cabrera Forwarded Emails (DN 34-13) (MHS project-site assessment forms, best-practices forms, and more).  Running a competing venture for MHS clients and customers, using MHS employees he recruited, likely violated Cabrera's fiduciary duties and suggest MHS will succeed on the merits of a fiduciary-duty claim.  *See Aero Drapery of Ky. v. Engdahl*, 507 S.W.2d 166, 169–70 (Ky.  1974) (fiduciary could not set up competing ventures while employed or use secrets learned from fiduciary employment).

[6] *See* Cabrera Text Messages (DN 44-36) (discussing terms and conditions of employment with Ernesto Troncoso); *see also* Cabrera Dep. (DN 48-1) at 83:7–12, 85:6–13, 86:4–19; 88:22–25, 89:19–24, 90:7–8, 90:13–17; 100:15–20, 101:25–103:6; Hearing Tr. at 248:10–23 (Cabrera testimony).

2) ¶ 46.  In all, at least 15 workers appear on both MHS and Precise Install employee lists.  *See* DN 59-3 (comparing the two).

That employees worked for both companies, Cabrera asserts, does not necessarily establish that he knowingly solicited MHS employees to join Precise Install.  This is true, as far as it goes.  But the overlapping payroll documents certainly corroborate the text messages discussed above that show Cabrera directly soliciting some of those same workers.

Cabrera also argues the employees' names were not always apparent to him.  He testified that MHS employees often used pseudonyms, Hearing Tr. at 245:7–10, 23, and that masks worn during Covid prevented him from recognizing their faces, *id.* at 244:11–245:23.  Neither observation undermines the direct evidence of recruitment, or the apparently undisputed point that many former MHS employees ended up on the Precise Install payroll.

As to Mireles, Defendants contend he was never an employee of Precise Install, but only appeared in the payroll so the company could repay his $100,000 initial investment.  Cabrera Dep. (DN 48-1) at 19:25–21:4, 23:1–21.  This explanation appears inconsistent with (or at least incomplete in light of) Mireles' receipt of $100,000 in Precise Install bonuses *in addition to* $14,410 in per diem and $51,590 in salary.  Precise Install Paysheet (DN 44-37).  And nothing in Cabrera's marginally relevant and marginally credible testimony about Mireles' particular situation could overcome the direct evidence of text messages sent by Cabrera to MHS employees soliciting their employment, coupled with the direct evidence that Mireles and many other MHS employees appeared on Precise Install paysheets.  This persuasive documentary evidence leads to the natural conclusion that MHS will likely prevail in showing that Cabrera violated his nonsolicitation agreement.

### c.  Nondisclosure Agreement

Cabrera's nondisclosure provision prevented him from "disclos[ing] to any third party any Confidential Information."  DN 1-2 at 15.  The contract defined this as "documents, memoranda, notes, plans, records, reports, and other documentation."  *Id.*  The agreement further required him to "deliver to the Company all of its ... Confidential information immediately at the end of employment."  *Id.*

 Cabrera accessed and emailed himself several confidential MHS documents.  A post-resignation forensic review of Cabrera's devices, conducted by MHS Chief Information Officer Eric Kierstead, revealed this.  *See* Kierstead First Decl. (DN 19-3) at ¶ 23; Kierstead Dep. (DN 44-4) at 88:2–15.  The search uncovered many MHS documents and data that Cabrera had forwarded to his personal email.  *See* Cabrera Forwarded Emails (DN 44-45).  These included an MHS document containing the company's installation best practices, project site-assessment checklists containing the company's protocol for installation surveys and project schedules, MHS training

protocols, employee-safety orientation protocols, safety-orientation agreements, weekly field reports, and other confidential information.  *See* Email (DN 34-13) (01/14/2020); Cabrera Forwarded Emails (DN 44-45); Kierstead First Decl. (DN 19-3) ¶ 18.

In addition, MHS's forensic analysis indicated that while Precise Install worked to prepare a bid on an Amazon project, Jose Mireles (who helped found Precise Install) accessed an MHS SharePoint database entitled "Material Handling Systems Holdings Team Site – Amazon Projects – All Documents."  Kierstead Second Decl. (DN 44-17) ¶¶ 7–8.  This database contains all the company's confidential information on its past and projected future relationships with Amazon.  Cabrera had never worked on an MHS project for Amazon, and offered no evidence why he would've needed or accessed this information for a legitimate purpose.  Clifton Dep. (DN 44-1) at 90:15–25.

And the day before Cabrera returned his MHS-issued electronic devices, he inserted an USB drive into the computer and downloaded additional documents and files from his MHS computer.  Cabrera Dep. (DN 48-1) at 97:2-4, 132:19-24.  That USB drive contained schematics, designs, and drawings for MHS projects.  Kierstead Second Decl. (DN 44-17) ¶¶ 3–4.  Cabrera also reset his MHS-issued iPhone to its factory settings before returning it, though he saved a copy of the phone's contents on his personal iCloud drive, obscuring much of his activity from MHS.  *See* Cabrera Dep. (DN 48-1) at 124:13–125:25.

During the hearing, Cabrera offered no meaningful rebuttal to MHS's presentation of this evidence.  Instead, Defendants' supplemental brief objects that these documents weren't actually "confidential."  Supp. Brief (DN 60) at 7–9.  For example, they note that the word "confidential" did not appear on the pages of the best-practices document, and that those practices evolve over time.  *See* Hearing Tr. at 169:22–170:21 (Buckley testimony).  But the lack of a confidentiality legend or static set of materials isn't dispositive under the broad contractual language that prevented Cabrera from sharing any of the "documents, memoranda, notes, plans, records, reports, and other documentation" that he took.  Restrictive Covenant (DN 1-2) at 15.

Cabrera further argued that he only copied the files onto a USB drive to share with his successor.  *See* Cabrera Dep. (DN 48-1) at 134:15-135:9.  Cabrera's own testimony calls this into question, however.  The files he copied onto the USB drive (allegedly for his successor) came from the same laptop that he gave his successor anyway.  It's unclear why he would hand over two versions of the same materials to the same person.  *See id.* at 127:19-25.

More important, Cabrera forwarded these documents to his personal Gmail account, which he used to conduct Precise Install business.  *See* Precise Install Emails (DN 44-46).  This likely amounts to an unauthorized disclosure of MHS information.

Remember that Defendants' position is that Precise Install is a distinct corporate entity and not Cabrera's alter ego. *See* § III above. If we accept that position for the sake of argument, Cabrera's apparent disclosure of these files to his company for a non-MHS purpose would violate the terms of his agreement not to disclose confidential information. Moreover, Cabrera failed to return these confidential documents to MHS at the conclusion of his employment, which the language of the covenant treats as a distinct obligation. Restrictive Covenant (DN 1-2) at 15. So MHS has proven a likelihood of success on the merits.[7]

## B. Irreparable injury

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d at 550 (citation omitted). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). The Sixth Circuit has deemed that "the loss of fair competition" resulting "from the breach of a non-competition covenant" to be an irreparable harm. *York Risk Servs. Group. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019). That's because "[t]he policy behind enforcing noncompetition clauses is to protect businesses against employees resigning and taking value clients with them." *Kethan*, 209 F.3d at 929. And although evidence of lost customer goodwill is less clear at this stage, this also represents a cognizable form of irreparable injury under the Sixth Circuit's precedents. "[L]oss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *see also Certified Restoration Dry Cleaning*

---

[7] Plaintiffs claim that the same facts giving rise to Cabrera's breach of the nondisclosure agreement also violate the Kentucky Uniform Trade Secrets Act. KRS § 365.882(1) authorizes a party to enjoin "[a]ctual or threatened misappropriation" of its trade secrets. To prevail on a "KUTSA" claim, a plaintiff must establish that (1) the information qualifies as trade secrets and (2) defendants "misappropriated" that information. *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 29 (6th Cir. 2011). A trade secret is any "information, including a formula, method, technique, or process, that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." *Id.* (quoting Ky. Rev. Ann. Stat. § 365.880(4)).

MHS is also likely to prevail on this claim because the information allegedly taken by Cabrera and Mireles, including bid-sheets, scheduling forms, project-site assessments, and other documents, likely qualify as trade secrets under the KUTSA. "[B]id documents, bid preparation tools, and pricing information are trade secrets under the KUTSA." *Alph C. Kaufman v. Cornerstone Industries*, 540 S.W.3d 803, 818 (Ky. Ct. App. 2017) (bid information forwarded to employee's personal email "was valuable and confidential because it would allow a competitor to underbid" the employer).

*Network*, 511 F.3d at 550; 11A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d. ed. 2021) ("Loss of goodwill often supports a finding of irreparable injury in cases in which employers seek to enforce restrictive covenants against their former employees to prevent them from contacting their customers.").

MHS uses restrictive covenants to protect itself from unfair competition by former employees and to protect the company's goodwill among clients. *See* Clifton Dep. (DN 44-1) at 106:4–18; Buckley Dep. (DN 44-2) at 80:11–17; Hearing Tr. (DN 56) at 161:1–12 (Buckley testimony). Shane Clifton claimed that the company suffered damages to its corporate goodwill when Cabrera solicited workers to leave an MHS worksite, thereby jeopardizing contractual deadlines and harming the corporation's relationship with customers and its reputation in the industry. *See* Hearing Tr. (DN 56) at 119:13–20, 166:7–167:7. To avoid this risk, the company requires "all ... MHS employees ... hire[d] in [to] sign a noncompete." Clifton Dep. (DN 44-1) at 106:8–9.

The evidence shows that Cabrera took possession of MHS's confidential information, contracted with MHS customers, solicited MHS employees to join his competing venture, and directly competed against his former employer on contracts MHS could have performed. MHS has not offered a dollars-and-cents accounting of harms suffered, nor could it at this juncture. How exactly would the company calculate the costs imposed by an employee's recent misappropriation of corporate secrets? "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550 (quotation omitted)). That is true here. At this juncture, the record contains ample evidence that Cabrera breached contractual duties, and that both Defendants imposed costs on MHS in the form of the "loss of fair competition" and "loss of customer goodwill." *Basicomputer Corp.*, 973 F.2d at 512; *see Certified Restoration Dry Cleaning Network*, 511 F.3d at 550. But it is hardly clear how MHS could or should quantify or avoid the harms that have been and would be incurred by a manager using confidential business information to solicit customers and employees alike. MHS has suffered, and would continue to suffer, irreparable injury absent an injunction preventing Cabrera's future violations.

## C. Substantial Harm to Others

The third prong the Court must consider is whether the issuance of an injunction will cause "substantial harm to others." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550–51. Even if it would, this factor does not necessarily overcome a plaintiff's showing of a strong likelihood of success on the merits. *See, e.g.*, *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 333–34 (6th Cir. 1997) (discounting harm to defendant because plaintiff showed likelihood of success on the merits); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (same).

The Defendants initially recognized that "it is not inequitable to require a former employee fulfill his contractual promise." Opp. Brief (DN 48) at 38. Reversing course, they later argued that MHS's requested injunction would harm Cabrera's family by preventing him from working in the conveyor-installation field. *See* Supp. Brief (DN 60) at 13. But that is exactly what the evidence at this stage indicates that Cabrera agreed to do as part of his bargain to work as a manager for MHS. Holding him to the terms of that contract is not a "substantial harm" that could outweigh the threatened injury to MHS.

This is especially true in light of the Sixth Circuit's recognition that such harms may be less concerning if caused by a defendant who "knowingly and illegally placed itself" in position to be harmed. *Brake Parts*, 443 F. App'x at 33 ("discounting harm to defendant in enjoining him 'from doing something he already should not be doing'") (quoting *Hickman v. Truitto*, No. 1:06-cv-151, 2007 WL 21080090, at *3 (E.D. Tenn. Apr. 9, 2007)); *see Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) (describing the "harm" suffered by a defendant prevented from continuing trademark infringement to be "hardly a legally cognizable one"); *see also Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003) (interest in enforcing noncompete agreements outweighed loss to enjoined defendant). The "balance of hardship[] tip[s] in favor of a preliminary injunction in suits against former employees to enforce terms of noncompetition agreements," commentators have recognized, "because the threat to the employer in terms of loss of goodwill and customers outweigh[s] that to ... employees who simply would be required to abide by the law or an agreement the employee freely made." 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.2 (3d ed. 2021).

An injunction will not impose substantial harm on Cabrera in light of the Court's ruling that Cabrera's noncompete agreement is likely enforceable, and that Cabrera obtained MHS confidential information, raided the MHS workforce, and competed directly against MHS by bidding on projects for MHS competitors and clients. *See Brake Parts*, 443 F. App'x at 33; *Lorillard Tobacco Co.*, 453 F.3d at 382. Furthermore, Cabrera may use his management and technical skillset to work in any field outside those covered by his agreement. That noncompete clause simply proscribes Cabrera from working for certain companies involved in the design,

installation, or service of automated or manual sortation systems. *See* Hearing Tr. 118:20–119:9 (Clifton testimony). Any harm he suffers because of this injunction is directly traceable to his violation of contractual duties he agreed to. *See* Restrictive Covenant (DN 1-2) at 14–19.

### D. Public Interest

The final preliminary-injunction factor requires the Court to consider "whether the public interest would be served by issuance of the injunction." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). The Sixth Circuit has held that "the public interest is always served in the enforcement of valid restrictive covenants." *FirstEnergy Sols. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013); *Handel's Enterps. v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019); *see also Management Registry, Inc. v. Calvetti*, No. 3:18-cv-201, 2018 WL 1660087, at *2 (W.D. Ky. Apr. 5, 2018) (same).

As previously discussed, Cabrera's contract is likely valid and enforceable, and appears to fall well within the limits Kentucky law places on nationwide noncompete agreements, as reflected in the state- and federal-court decisions discussed above in § III(A)(1)(d). Issuing this preliminary injunction will promote the public interest and preserve the freedom to contract by enforcing the terms of parties' agreements. *See PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007).

\*     \*     \*

MHS has shown that it will likely succeed on the merits of its claims, that it would be irreparably harmed without an injunction, and that preventing Cabrera's violations will serve the public interest. Cabrera's protest that he and his family will suffer substantial harm of their own isn't entitled to much weight in light of Cabrera's agreement, and certainly doesn't overcome MHS's strong showing on the other three prongs.

### IV.   Security

Rule 65(c) authorizes a district court to issue a "preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The burden falls on the party being enjoined to make out an entitlement to the bond amount requested. *See Appalachian Reg'l Healthcare v. Coventry Health & Life Ins.*, 714 F.3d 424, 432 (6th Cir. 2013); *RGIS, LLC v. Gerdes*, No. 19-11866, 2020 WL 409657, at *1 (E.D. Mich. Jan. 24, 2020) ("The party being enjoined has the burden of establishing the need for a bond and the required amount.") (citing *ARH*, 714 F.3d at 432).

Here, Cabrera claims an entitlement to a bond of at least $4,913,913.96, which he says is necessary to cover the value of the four past and three future contracts

Precise Install entered into with Honeywell Intelligrated.  Brief in Support of Bond Request (DN 16) at 4–5.  This request, however, fails to distinguish between the contracts' gross revenues and net profits.  When pressed at the hearing, Cabrera could not or would not estimate the amount of profit he expected Precise Install to make on these contracts.  *See* Hearing Tr. 221:12–223:1.  Even assuming Precise Install would take in this sum absent an injunction, it would pay out much of that money in costs and wages—expenses that Precise Install presumably will forego as a result of the injunction.

In light of the Court's conclusion that MHS has a strong likelihood of prevailing on the merits, and because Cabrera failed to provide evidence in support of his requested bond amount, the Court finds a lower bond is appropriate.  Courts must fashion security requirements according to the evidence before them.  Here that evidence indicates that Cabrera earned roughly $250,000 from MHS in 2020 before he left for full-time work at Precise Install.  *See* Cabrera Paystub (DN 13-1) at 11–13; Hearing Tr. at 27:18–28:1 (Cabrera's counsel agreeing that annual income amounted to around $250,000 per year).  And the preliminary injunction ordered here will last no longer than two years from June 17, 2021, the date of Cabrera's resignation.  *See* Cabrera Dep. (DN 48-1) at 97:2–7.  The Court finds that security in the amount of twice Cabrera's 2020 income is grounded in the record and sufficient to protect his interests while this case proceeds to the merits.

The Court therefore orders MHS to provide security of $500,000.  MHS shall tender the security to the Clerk of Court no later than close of business Friday, November 13, 2021.

## V.   Scope of the Injunction

A. Neither Cabrera nor Precise Install, acting in concert with Cabrera, may disclose to any third party any of MHS's Confidential Information, which the parties' contract defines as "any confidential or trade secret information relating to the Business, including, but not limited to, matters of a technical nature, such as formulae, 'know how,' product  specifications, data, compositions, designs, sketches, photographs, samples, inventions and ideas, past, current and planned research and development, computer programs, systems and software (including, without limitation, documentation and related source and object codes), product sources, product research and designs, and matters of a business nature, such as business plans, Customer lists, Customer contact information, Customer preferences, Customer information, pricing lists, contracts, sales reports, sales and marketing data, on-site program and support materials, training programs and associated materials, systems, forms, methods, procedures, and analyses, financial information, sales information, business strategies, and any other proprietary information, whether communicated orally or in documentary or other tangible form." Restrictive Covenant (DN 1-2) at 14.

B. Cabrera must deliver to MHS "all of its property and Confidential information" that relates "to the Business and any other Confidential Information or Company property" and that Cabrera retains in his possession. *Id.* at 15.

C. Neither Cabrera nor Precise Install, acting in concert with Cabrera, may participate or engage in, directly or indirectly any business for any entity that derives "25% or more of its revenue from operations involving the design, manufacture, installation or servicing of automated or manual sortation systems for the courier, warehouse and distribution, or e-commerce market" anywhere in the United States. *Id.* at 17.

D. Neither Cabrera nor Precise Install, acting in concert with Cabrera, may "solicit or induce any then-existing employee of [MHS] to leave employment with the Company or contact any then-existing customer or vendor under contract with the Company or any of its subsidiaries for the purpose of obtaining business similar to that engaged in, or received (as appropriate), by the Company," without the prior written consent of MHS. *Id.*

## CONCLUSION

The Court grants the motion for a preliminary injunction (DN 44), denies the motion for a temporary restraining order as moot (DN 19), denies the motion to dismiss for lack of jurisdiction with respect to Cabrera (DN 21), grants the motion for leave to file excess pages (DN 46), and grants the motions for leave to seal (DNs 58, 59).

Benjamin Beaton, District Judge
United States District Court

November 10, 2021